**MITSUBISHI MOTORS CORPORATION,**
Plaintiff, Appellee,

v.

**SOLER CHRYSLER–PLYMOUTH, INC.,**
Defendant, Appellant.

No. 82–1913.

United States Court of Appeals,
First Circuit.

Argued April 4, 1983.

Decided Dec. 20, 1983.

156

Benjamin Rodriguez-Ramon, San Juan,
P.R., with whom Jerome Murray, Robert G.
Post, John Nocera, New York City, and

Rodriguez-Ramon, Pena & Cancio, San Juan, P.R., were on brief, for defendant, appellant.

Wayne A. Cross, New York City, with whom Robert L. Sills, William I. Sussman, William Dunnegan, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, Samuel T. Cespedes, Ana Matilde Nin, and McConnell Valdes Kelley Sifre Griggs & Ruiz-Suria, San Juan, P.R., were on brief, for plaintiff, appellee.

William F. Baxter, Asst. Atty. Gen., Robert B. Nicholson, Marion L. Jetton, Attys., Dept. of Justice, Harold G. Maier, Counselor on International Law, Robert K. German, Atty., Dept. of State, Washington, D.C., on the brief, for amicus curiae.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

COFFIN, Circuit Judge.

Soler Chrysler-Plymouth Corp. appeals from the grant of an order compelling arbitration of certain claims and counterclaims between it and Mitsubishi Motors Corp. The principal issue on this appeal is whether arbitration of federal antitrust claims may be compelled under the Federal Arbitration Act, 9 U.S.C. §§ 4, 201, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517 (1970).

I. Background

Soler Chrysler-Plymouth ("Soler") is a Puerto Rico corporation, formerly a franchised Chrysler dealer, with its principal place of business in Puerto Rico. Mitsubishi Motors Corp. ("Mitsubishi") is a Japanese corporation and automaker with its principal place of business in Japan. Mitsubishi was formed in 1970 as part of a joint venture between Chrysler International, S.A. ("Chrysler"), a Swiss corporation and wholly owned subsidiary of the U.S. Chrysler Corp., and Mitsubishi Heavy Industries, Inc. Under the joint venture, Mitsubishi manufactured vehicles for sale in certain territories outside the continental United States through Chrysler dealers such as Soler.

Soler became a Chrysler-Mitsubishi dealer in 1979 when it entered into a "distributor agreement" with Chrysler. At the same time, Soler entered into a separate "sales procedure agreement" with both Chrysler and Mitsubishi, paragraph VI of which contains the arbitration clause in issue here. Under that clause, "[a]ll disputes, controversies or differences which may arise between [Mitsubishi and Soler] out of or in relation to Articles I–B through V of [the sales procedure agreement] or for breach thereof, shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association".

The dispute in this case had its genesis some two years later in the soft new car market of 1981 when Soler became unable to meet minimum sales commitments in its territory, and Mitsubishi and Chrysler refused to permit Soler to "transship" vehicles to Central and South America and the continental United States. As Soler's inventory swelled and its finances worsened, Mitsubishi withheld shipment of additional new vehicles to Soler, eventually storing some 966 vehicles in Japan.

In February 1982, Soler disclaimed responsibility for the 966 vehicles stored in Japan. A month later, on March 15, Mitsubishi brought suit against Soler in federal court, alleging nonpayment for the stored vehicles, nonpayment of contractual storage penalties, damage to Mitsubishi's warranties and goodwill, expiration of Soler's distributorship, and other breaches of the sales procedure agreement. On the basis of these allegations, Mitsubishi petitioned for an order compelling arbitration under the Federal Arbitration Act, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and the Convention's implementing legislation. On March 18, Mitsubishi filed a request for arbitration with the Japan Commercial Arbitration Association.

Soler denied the allegations and counterclaimed, alleging violations of, *inter alia,* the Sherman Act, 15 U.S.C. §§ 1 *et seq.,* the Federal Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221 *et seq.,* the Puerto

Rico Dealers' Act, 10 L.P.R.A. §§ 278 et seq., and the Puerto Rico antitrust and unfair competition statute, 10 L.P.R.A. §§ 257 et seq.

The district court ordered arbitration of all the above claims and counterclaims and entered partial final judgment to that effect under Fed.R.Civ.P. 54(b). As to certain additional counterclaims against Mitsubishi and Chrysler, the district court retained jurisdiction, finding that they were outside the scope of the arbitration clause. Soler thereupon appealed.

Soler does not dispute the district court's referral of Mitsubishi's claims to arbitration, and neither Chrysler nor Mitsubishi challenges the district court's retention of jurisdiction over certain of Soler's counterclaims. Our review is therefore limited to two arguments raised by Soler: that its statutory counterclaims are outside the arbitration clause, and that its Sherman Act claims are in any event nonarbitrable as a matter of law. We examine each argument in turn.

## II. Validity of the Arbitration Clause

Soler argues that the arbitration clause is of no effect because Puerto Rican law does not recognize any arbitration agreement that "obligates a dealer to ... arbitrate ... any controversy ... regarding [the] dealer's contract outside of Puerto Rico, or under foreign law or rule of law". 10 L.P.R.A. § 278b–2. For several reasons, we reject Soler's argument.

First, federal law preempts the direct application of section 278b–2. Under 9 U.S.C. § 2, arbitration agreements are declared valid and enforceable as a matter of preemptive federal law, "save upon such grounds as exist at law or in equity for the revocation of *any* contract" (emphasis added); state laws like 10 L.P.R.A. § 278b–2 that single out arbitration agreements are preempted.

Evidently recognizing the force of federal preemption, Soler does not argue that section 278b–2 applies *directly*. Instead, it argues that section 278b–2 is in effect "incorporated" indirectly into the sales procedure agreement, on the theory that the Soler-Chrysler distributorship agreement contains a savings and separability clause for provisions in violation of local law,[1] and that article XII of the sales procedure agreement "incorporates" the savings and separability clause of the distributorship agreement into the sales procedure agreement.

The short answer to this tortured argument is that the savings and separability clause on its face applies only to the distributorship agreement between Chrysler and Soler; it does not apply to the sales procedure agreement with Mitsubishi. Moreover, the purposes of article XII and the separability clause are not implicated here. Article XII of the sales procedure agreement does not actually "incorporate" the distributorship agreement into the sales procedure agreement; it merely obligates Mitsubishi to avoid action inconsistent with the distributorship agreement in certain circumstances.[2] The separability clause of the

---

1. The separability clause of the distributor agreement reads as follows:

   "22. LEGAL INTERPRETATION
   This Agreement is made in, and will be governed by and construed in all respects according to the laws of the Swiss Confederation as if entirely performed therein, and will bind the heirs, executors, administrators, successors and assigns of both parties. If it is found that any portion or portions of this Agreement violate in any particular any law of any government or governmental unit, division or subdivision having jurisdiction in the premises, and said violation would cause said authorities to consider this Agreement as void and without effect regardless of the

present election of law, then within that political unit, division or subdivision, such portion or portions of this Agreement will be of no force and effect, and this Agreement will be treated in any such jurisdiction as if such portion or portions had not been inserted herein."

2. Article XII of the sales procedure agreement reads as follows:

   "XII—STATUS OF DISTRIBUTOR AGREEMENT
   The Distributor Agreement remains in full force and effect between CISA and Buyer *except that the provisions thereof which are in conflict with this Agreement shall be deemed to be in suspense during the term*

distributorship agreement in turn is designed to preserve the larger aspects of the distributorship agreement when one of its portions violates local law. Nothing in the arbitration clause, however, violates local law or threatens the distributorship agreement, for section 278b–2 is preempted by the federal Arbitration Act. Even if there were no preemption and section 278b–2 did apply, the only result would be to render the arbitration clause void; the remainder of the sales procedure agreement would stand, as would the distributorship agreement.

III.  Scope of the Arbitration Clause

■ Our analysis of the arbitration clause is guided by two basic principles. First, the scope of the clause as it appears on the face of the contract is a question of law for our independent determination and not, as Mitsubishi argues, one of fact reversible only for clear error. Second, all doubts are resolved in favor of arbitration; arbitration will be ordered "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute". *United Steelworkers of America v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960).

■ Soler argues that it never specifically agreed to arbitrate controversies that arose under such statutes as the Sherman Act. Soler, however, mistakes the nature of our inquiry. The arbitration clause of the sales procedure agreement is not limited to contractual claims, but extends to "*all*

disputes, controversies or differences" arising "out of" or "in relation to" Articles I–B through V of the agreement, as well as "for breach thereof" (emphasis added). The question, therefore, is not whether the arbitration clause mentions antitrust or any other particular cause of action, but whether the factual allegations underlying Soler's counterclaims—and Mitsubishi's bona fide defenses to those counterclaims—are within the scope of the arbitration clause, whatever the legal labels attached to those allegations.[3]

At the same time, the arbitration clause is not unlimited in scope. It does not extend to all disputes of any sort or to all provisions of the sales procedure agreement, but only to disputes touching specified provisions of the agreement. In addition, although Soler itself argues in another context that the issues in the case are too interwoven to separate, Soler's "defenses" are also counterclaims, and on their face raise matters extraneous to Mitsubishi's claims. We therefore reject the temptation to hold Soler's counterclaims arbitrable solely because they are raised as defenses to claims covered by the arbitration clause. Rather, we look to the specific allegations underlying the dispute and determine arbitrability on an allegation-by-allegation basis. With these principles in mind, we turn to Soler's counterclaims.

A.  Puerto Rico Dealers' Act

■ The crux of Soler's counterclaim under the Puerto Rico Dealers' Act[4] is that Mitsubishi "refused to comply with the terms and conditions of the Sales Procedure

hereof, and to the extent that no such conflict exists, MMC hereby agrees not to take any action inconsistent with the provisions of the Distributor Agreement not deemed to be in suspense in its relationship with BUYER pursuant to this Agreement." (Emphasis added.)

3. Although the sales procedure agreement states that it is to be governed by Swiss law, the scope of an arbitration agreement is an issue of federal law. *See Acevedo Maldonado v. PPG Industries, Inc.,* 514 F.2d 614, 616 (1st Cir.1975) and authorities cited thereat. In any event, the parties have neither argued nor of-

fered to prove Swiss law, and have not suggested that Swiss contract law of general applicability would generate a different result.

4. The Dealers' Act provides that, "[n]otwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." 10 L.P.R.A. § 278a.

Agreement concerning orders placed for delivery of automobile products to Soler". Since the relevant terms and conditions are contained in the portions of Article I of the sales procedure agreement that are subject to arbitration, Soler's first counterclaim is plainly within the arbitration clause.

### B. Sherman Act

Soler's Sherman Act counterclaim poses a murkier problem. The gist of Soler's theory is that Mitsubishi and Chrysler unlawfully divided markets. To that end, Soler alleges, Mitsubishi unjustifiably refused to allow transshipment of vehicles from Puerto Rico to North, Central, and South America. In addition, Soler alleges that Mitsubishi engaged in a "boycott" and other predatory practices intended to drive Soler out of business—in particular, that Mitsubishi wrongfully refused to fill orders for parts and vehicles, and wrongfully terminated Soler's distributorship.

On this last allegation (wrongful termination), Mitsubishi asserts that Soler's distributorship expired by its own terms, and, in any event, that just cause for termination or nonrenewal existed by reason of Soler's failure to pay for orders and of other material breaches of the sales procedure agreement.

■■ Although some aspects of termination are, as Soler argues, outside the scope of the arbitration clause (see, e.g., Article VII: circumstances triggering automatic termination; notice in cases of automatic termination), the propriety of termination or nonrenewal here—i.e., the existence of "cause" for termination—necessarily and directly involves at least three other provisions of the sales procedure agreement: Article I–D(1) (dealer's orders "firm"), I–F (payment obligations and payment procedure), and I–E (distress unit penalties in event of nonshipment owing to dealer's

fault). These other provisions all fall within the arbitration clause.

On the nonshipment issue, Mitsubishi counters that shipment was withheld in most instances at Soler's own request, and that shipment was withheld on other instances because Soler failed to arrange an acceptable letter of credit. Since such a letter of credit is required for shipment under Article I–F of the sales procedure agreement, the nonshipment dispute would appear to be within the arbitration clause.

Finally, on the transshipment issue, Mitsubishi raises a number of justifications for refusing transshipment permission, among them Soler's inexperience with ocean shipping, its inability to make warranted postsale service on transshipped vehicles, and the unsuitability of vehicles manufactured to Puerto Rican specifications for use in countries with different climates and unsuitable grades of gasoline.[5] In essence, Mitsubishi's objections all raise concerns that transshipment "would immediately and irreparably damage [Mitsubishi's] name, reputation, goodwill and trademarks by creating the false impression that [Mitsubishi] vehicles are of substandard quality, and would therefore constitute acts of trademark infringement".

■ Under current antitrust thinking, such concerns are relevant to the legality of territorially based restricted distribution arrangements of the sort in issue here. See Continental T.V. v. GTE Sylvania, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). We need not delve further into the merits of Mitsubishi's defense, however, for it is enough for present purposes that its trademark and goodwill concerns are plainly germane to Soler's antitrust allegations. The only remaining question is whether those concerns implicate a provision of the sales procedure agreement covered by the arbi-

---

**5.** Mitsubishi was concerned that additional equipment such as heaters and defoggers would be required in the countries to which Soler contemplated transshipment, and that such equipment "might be installed in an unworkmanlike manner, or might violate local motor vehicle laws". Letter of Yasuo Goto to Soler Chrysler-Plymouth, Inc., September 4, 1981. As for fuel, Mitsubishi feared that the use of leaded or low-octane unleaded fuel commonly available in Latin America would drastically shorten the life of its cars and would cause Mitsubishi cars to appear seriously underpowered.

tration clause. An examination of Article IV of the agreement persuades us that they do.

Under Article IV, the "manner in which [Soler] ... shall use [Mitsubishi's] Trademarks" is "subject to prior approval by [Mitsubishi]":

> "In the event that [Mitsubishi] shall object to the manner in which BUYER or any Controlled Person is using or allowing Dealers to use any Trademark, *either on Products* or in advertising *or otherwise,* BUYER agrees promptly to remedy the situation to [Mitsubishi's] satisfaction." (Emphasis added.)

While the transshipment dispute undeniably implicates other, uncovered provisions of the sales procedure agreement and the Chrysler-Soler distribution agreement, we cannot say that the transshipment dispute's connection with Article IV is insufficient to trigger the arbitration clause. We therefore conclude that Soler's transshipment allegations, like its nonshipment and termination allegations, are within the scope of the arbitration clause.

We discuss in part IV of this opinion the important question whether these claims, though within the scope of the arbitration clause, are arbitrable.

### C. Dealers' Day in Court Act

On appeal, Soler advances two contentions under the federal Dealers' Day in Court Act.[6] The first is that Mitsubishi acted in bad faith "in establishing minimum sales volumes for Soler"; the second is that Mitsubishi attempted to "coerce and intimidate Soler into accepting a proposal whereby Mitsubishi would replace Soler with its own wholly owned subsidiary."

6. The act provides as follows:
   "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of

[8, 9] As for the latter contention, the allegation arises from Soler's difficulties in paying for orders. It essentially restates allegations made in claims under the Puerto Rican Dealers' Act and the Sherman Act. It is sufficiently related to covered articles of the sales procedure agreement to trigger the arbitration clause. As for the minimum sales agreement, the district court itself held with respect to another of Soler's counterclaims that minimum sales volumes were outside the scope of the arbitration clause. Neither Mitsubishi nor Chrysler challenges this conclusion. We reach the same conclusion.

### D. Puerto Rico Antitrust Law

Soler's local antitrust claim relies entirely on the factual allegations made in connection with the three claims already discussed.[7] It therefore suffices to state that the counterclaim is within the arbitration clause to the same extent as the three foregoing counterclaims, and is outside the arbitration clause to the same extent as Soler's federal Dealers' Day in Court claim.

### IV. Arbitrability of the Antitrust Issues

The second major question in this appeal is whether the antitrust issues raised by Soler's third counterclaim are subject to arbitration. We have already determined that they are germane to issues covered by Article I and Article IV of the sales procedure agreement. The important question now before us is whether, despite such coverage, they are nonarbitrable because of a judicially created policy, hitherto applied only to "domestic" contracts involving Unit-

the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* that in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith." 15 U.S.C. § 1222.

7. In brief, the Puerto Rico statutes in question forbid contracts, combinations, and conspiracies in restraint of trade, 10 L.P.R.A. § 258, and unfair methods of competition, *id.* § 259.

ed States citizens, reserving antitrust issues for judicial determination.

Because this question appeared as one of first impression, we sought, after hearing argument, the views of the United States as an amicus curiae. In a brief submitted by the Department of Justice and joined in by the Legal Advisor of the Department of State, the United States urged that we apply to international contracts the same antitrust exception to arbitrability that courts, beginning with *American Safety Equipment Corp. v. J.P. Maguire & Co.*, 391 F.2d 821 (2d Cir.1968), have applied to purely domestic agreements. After deliberation, we agree.

We divide our discussion into three areas. First we consider whether recognition of the antitrust exception to arbitrability is compatible with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards [reprinted following 9 U.S.C. § 201 (Supp.1982)] ("Convention"), which was adopted by a United Nations conference in 1958, consented to by the United States in 1970, and implemented when Congress passed Chapter 2 of the United States Arbitration Act, 9 U.S.C. § 201 *et seq.* Finding that it is compatible, we next consider whether, as the district court held, *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), proscribes application of the *American Safety Equipment* doctrine to the contract in this case. Concluding that *Scherk* does not so proscribe, we reach the final inquiry: since Soler's antitrust claims against Mitsubishi must be decided by a court, should the district court stay all arbitration pending a judicial decision? We answer this by concluding that decisions as to separability of issues, likelihood of success of the antitrust claims, and timing are within the informed discretion of the district court.

**A. The Convention and the Antitrust Exception**

■ We begin by noting a rarity in our jurisprudence, the overriding of a strong policy in favor of arbitration as evidenced by the Federal Arbitration Act, 9 U.S.C.

§ 1 *et seq.,* by a judicially created rule excepting antitrust claims. This ruling, the reasons marshalled for it, and the unanimity of its acceptance in the field of domestic contracts are solid evidence of the strength of the policy on nonarbitrability. The most complete exegesis is found in the decision establishing the exception, *American Safety Equipment, supra.* The reasoning is fourfold: (1) governance of the realm of antitrust law, so vital to the successful functioning of a free economy, is delegated by statute to both government and private parties, the latter being given special incentive to supplement efforts of the former, the work of both being equally the grist of judicial decisions, 391 F.2d at 826; (2) the strong possibility that contracts which generate antitrust disputes may be contracts of adhesion militates against automatic forum determination by contract, *id.* at 827; (3) antitrust issues are—an understatement—"prone to be complicated, and the evidence extensive and diverse", *id.,* and, we may add, the economic data subject to rigorous analysis dictated by a growing and increasingly sophisticated jurisprudence, with the subject correspondingly ill-adapted to strengths of the arbitral process, *i.e.,* expedition, minimal requirements of written rationale, simplicity, resort to basic concepts of common sense and simple equity; and (4) the notion, suggestive of the proposition that issues of war and peace are too important to be vested in the generals, that decisions as to antitrust regulation of business are too important to be lodged in arbitrators chosen from the business community—particularly those from a foreign community that has had no experience with or exposure to our law and values. *Id.*

■ So far as we have ascertained, all other circuits that have had occasion to consider the doctrine of *American Safety Equipment* have embraced it. *Applied Digital Technology, Inc. v. Continental Casualty Co.*, 576 F.2d 116, 117 (7th Cir.1978); *Cobb v. Lewis*, 488 F.2d 41, 47 (5th Cir. 1974); *Helfenbein v. International Industries, Inc.*, 438 F.2d 1068, 1070 (8th Cir. 1971); *Power Replacements, Inc. v. Air Pre-*

*heater Co.,* 426 F.2d 980, 983–84 (9th Cir. 1970). We conclude, therefore, that the nonarbitrability of antitrust issues in domestic contract disputes is established as solid and sound doctrine.

Before endeavoring to parse the Convention, we pause to examine whether there are factors which suggest that the exception be confined to disputes between United States citizens. We begin by noting that the antitrust laws apply to restraints not merely of interstate but also of foreign commerce. 15 U.S.C. § 1. Although the presence of foreign parties is a factor that should be considered in deciding to take jurisdiction of a case involving foreign conduct, it is not dispositive. *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir.1976); *Mannington Mills, Inc. v. Congoleum Corp.,* 595 F.2d 1287 (3d Cir. 1979).

More importantly, we consider two questions. The first is: is the American antitrust ethic and system of law so "parochial" that insistence on the application of the nonarbitrability of antitrust issues to international agreements would be anathema to other countries and would incite retaliation? We have in mind the admonition in *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 9, 92 S.Ct. 1907, 1912, 32 L.Ed.2d 513 (1972), to abjure parochial considerations.

We doubt that other nations are ignorant of the primacy we accord to antitrust law. A typical reference to our ideological topography is the Court's statement in *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972):

> "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms."

We are advised by the United States that the Federal Republic of Germany also ac-

cords high status to its antitrust rule and prohibits agreements entrusting future such disputes solely to arbitration.[8] We also note the policy of the European Economic Community, as embodied in the Treaty of Rome, in Articles 85–90, to forbid practices restricting or distorting competition. In any event, whether or not other nations agree with United States law and attitudes relating to competition, it is extremely doubtful that they would describe them as "parochial" in the sense of being petty provincialisms.

The obverse question, whether any policy reason supports the application of the rule against arbitration of antitrust issues to agreements involving American companies and foreign suppliers and sellers, is also easily answered. In an increasingly interdependent and interrelated commercial world, where the multinational corporation with ties to several countries is becoming more prevalent, *see Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 533, 94 S.Ct. 2449, 2463, 41 L.Ed.2d 270 (1974) (Douglas, J., dissenting), the insulation of agreements with some international coloration from the antitrust exception would go far to limit it to the most minor and insignificant of business dealings. Indeed, suppliers and sellers could achieve immunity from antitrust law threats and sanctions by the simple expedient of co-opting some foreign or international entity into the arrangement. Specifically, the sovereign sway of antitrust law and policy in the United States economy would be hopelessly fragmented if, say, all domestic manufacturers with overseas partners, suppliers, or financers could force all their dealers and distributors to arbitrate their antitrust claims.

We conclude that the nonarbitrability of antitrust issues is an American doctrine that is alive, well, justified both in its conception and in its application to at least the kind of international agreement we confront in this case—an agreement governing the sales and distribution of vehicles *in the United States.* What remains for us to do

---

**8.** *See* section 91(1) of the Act Against Restraints of Competition, reprinted in OECD, I Guide to Legislation on Restrictive Business Practices (1980).

is to see how such law and policy fit, if at all, with the Convention.

The Convention, insofar as it concerns the problem we are dealing with, was preceded by very little helpful history, and followed by very little illuminating history or adjudication. We work with a scattering of crumbs—and, hopefully, a sound sense of the balance struck by the Convention between deeply felt national policies and the desire to facilitate international arbitration. The Convention has three relevant categories of decision making. The first is simply the definition of an arbitration agreement for "recognition" purposes. To be recognized, an agreement must involve "subject matter capable of settlement by arbitration". Article II(1). A second category, narrower than the first, defines those recognized arbitration agreements that must be referred to arbitration; they include only those recognized, arbitrable agreements that are not "null and void, inoperative or incapable of being performed". Article II(3). A third category deals not with recognition or reference to arbitration but with the enforcement of arbitral awards. One provision is symmetrical with the earlier provision regarding reference and simply says that an award will not be recognized or enforced if "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country [where recognition and enforcement are sought]". Article V(2)(a). Another, however, introduces a new concept in saying that an award may not be enforced if "recognition or enforcement of the award would be contrary to the public policy" of the affected country. Article V(2)(b). Thus, theoretically, there could be a duty to refer a matter to arbitration under Article II(3), even though it was so offensive to a nation's public policy that it could not be enforced under Article V. Our own approach make it unnecessary to try to fill this hiatus, although there is respectable authority for such an effort.[9]

Our analysis begins by excluding that part of Article II(3) which would bar from reference to arbitration any provision that is "null and void, inoperative or incapable of being performed". In *Ledee v. Ceramiche Ragno,* 684 F.2d 184, 187 (1st Cir.1982), we declared that this "clause must be interpreted to encompass only those situations—such as fraud, mistake, duress, and waiver—that can be applied neutrally on an international scale." We see no reason to withdraw this statement, which is consistent with the proposition that the public policy exception in Article II(3) is to be narrowly construed. This clause seems to us to be of a different order from the words in Article II(1), not addressed in *Ledee,* requiring as a prerequisite for recognition "subject matter capable of settlement by arbitration".

The precise question we ask is whether a matter that has been barred by unanimous judicial precedent for a decade and a half from resolution by arbitration, because of a multiplicity of solid reasons that lose no pertinence or weight in an international context, is a matter "capable of settlement by arbitration". It seems to us that "capable" means legally capable—for any matter can theoretically be arbitrated or compromised, even if the decision be to divide an infant. 1 Kings 3:16–28. And if, absent fraud, mistake, duress, and waiver and absent something shocking to the sensibilities of a nation's public policy, there is no other

---

**9.** Justice Douglas, in his dissenting opinion in *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 530–31 n. 10, 94 S.Ct. 2449, 2462–63 n. 10, 41 L.Ed.2d 270 (1974), recapitulates the conference discussion of this hiatus and quotes G.W. Haight, a delegate to the conference, representing The International Chamber of Commerce, as speculating that "courts may under this wording be allowed some latitude; *they may find an agreement incapable of performance if it offends the law or the public policy of the forum*". (Emphasis in opinion.) In other words, it could be argued that an agreement to arbitrate an antitrust dispute would, because it offends public policy under V(2)(b), be, ipso facto, "incapable of performance" under II(3) and should thus not even be referred to arbitration. As our discussion in the text, *infra,* indicates, we have taken a narrower view of "incapable of performance". We remain mystified, however, at the sense of, say, having to refer to arbitration a dispute involving the selling of slaves, knowing that an award could never be enforced.

basis for refusing arbitration, then the Convention's words "capable of settlement by arbitration" have no meaning at all.

We are aided in reading some meaning into this clause by statements made in a memorandum from the Department of State when the Convention was submitted to the Senate. Apropos of the clause we are interpreting, the memorandum explained:

> "[T]he requirement that the agreement apply to a matter capable of settlement by arbitration is necessary in order to take proper account of laws in force in many countries which prohibit the submission of certain questions to arbitration." S.Doc.Exec. E, 90th Cong., 2d Sess. (1968), at 19.

As a specific example, it noted laws in some states of the United States precluding the arbitration of real estate title disputes. This seems to us suggestive of the kind of subject matter oriented, deep seated rejection of the arbitral process even more convincingly demonstrated in the *American Safety Equipment* exception. The same State Department memorandum also commented on the hiatus between Article II reference and Article V enforcement mentioned in footnote 9, *supra*. It expressed the view that the exceptions in V(2) would also be read into II(3)'s requirements for enforcing agreements to arbitrate. S.Doc. Exec.E., *supra*, at 19.[10]

This interpretation is emphatically reinforced by the scholarly commentary. Beginning in 1961, Leonard V. Quigley, commenting on the language of Article II(1), "capable of settlement by arbitration", remarked on the "[c]onsiderable latitude . . . thus afforded the tribunal deciding the issue of arbitrability" and speculated that "predictability of result under the Convention is weakened" by this latitude. *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* 70 Yale L.J. 1049, 1064 (1961). He noted the fact that Article V(2)(a), dealing with enforcement of awards, relegated the issue of arbitrability in that context to the laws of the country where enforcement is sought, and prophesied, "It can be expected that the courts of the State where recognition of the agreement is sought will adopt a similar standard of judging the arbitrability of the dispute under the law of the forum". *Id.* at n. 70.

Professor Gerald Aksen predicted that the "capable of settlement" provision of Article II(1) could be "one of the most troublesome". *American Arbitration Accession Arrives in the Age of Aquarius: United States Implements United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards,* 3 Southwestern University Law Review 1, 8 (1971). Although personally hoping that arbitrability would be decided by the arbitrator, he concluded, "Another provision in the Convention, however, in Article V para. 2(a) makes such a desirable result unlikely." *Id.* at 9 (footnote omitted). He thought this unfortunate because applying domestic standards of arbitrability "poses unduly complicated legal questions" and because the "public policy" language of Article V(2)(b) could be utilized to refuse enforcement of an award involving, for example, a question of antitrust law. *Id.* at 13. A similar regret about the "significant inadequacy" of Article II(1) was voiced by John P. McMahon, *Implementation of the United Nations Convention on Foreign Arbitral Awards in the United States,* 2 J.Mar.L. & Com. 735, 753 n. 83 (1971), with the recognition that Article V(2)(a) would "permit the court to refuse to recognize the agreement if its subject matter is incapable of settlement by arbitration under federal law."

---

**10.** Other examples of matters not "capable of settlement by arbitration", provided to us by the government, are *Audi-NSU Auto Union A.G. v. S.A. Adelin Petit & Cie* (Cour de Cassation, Belgium) (1979), *reported in* V Yearbook Commercial Arbitration 257 (1980) (Belgian law precludes arbitration of disputes arising under a Belgian law on unilateral termination of exclusive distributorships); *Compagnia Costruzioni v. Piersanti* (Corte di Cassazione, Italy) (1979), *reported in* VI Yearbook Commercial Arbitration 229 (1981) (Italian law precludes arbitration of labor disputes).

*Id.* at 757. *See also* Robert A.J. Barry, *Application of the Public Policy Exception to the Enforcement of Foreign Arbitral Awards Under the New York Convention: A Modest Proposal,* 51 Temp.L.Q. 832, 835 n. 14 (1978).

Finally, *International Commercial Arbitration New York Convention,* Booklet 1, September 1980 (G. Gaja ed.), at I.B. 2 states:

> "The similarity in the texts of Article II(1) and Article V(2)(a) and the fact that Article II was introduced in the Convention only at the late stage of the drafting indicate that also according to Article II the arbitrability of the dispute must be tested under the *lex fori*—the law of the State where the effects of the arbitral agreement are sought. (Footnote omitted)."

■ We therefore conclude that an agreement to arbitrate antitrust issues is not "an agreement within the meaning of" Article II(3) of the Convention because such an agreement does not concern "a subject matter capable of settlement by arbitration", as required by Article II(1). Not being such, any award, were such to be issued, could not be enforced, by the specific terms of Article V(2)(a).

### B. Does *Scherk v. Alberto-Culver Co.* Compel Arbitration?

*Scherk* poses a considerable roadblock to the above analysis, if its holding is extrapolated to fit a situation of demonstrably greater impact on the United States and a public policy of incommensurably greater depth. We note at the outset what would be the impact of such an extension: if even antitrust claims arising from international contracts are found to be arbitrable, the Convention's language "not capable of settlement by arbitration" would have little or no meaning.

In *Scherk* an American company selling toiletries in the United States and abroad acquired three European manufacturing companies from German defendant Fritz Scherk. The negotiations, the signing of the sales contract (which included a clause providing for arbitration of "any controversy or claim . . . [arising] out of this agreement or the breach thereof"), and the closing had been accomplished largely in European countries. The plaintiff company discovered that the critical trademarks, which defendant had warranted to be unencumbered, were indeed substantially encumbered, and brought suit in federal court, alleging that the defendant had misrepresented the status of the trademarks in violation of § 10(b) of the Securities Exchange Act of 1934.

Defendant moved that the action in federal court be dismissed or that it be stayed pending arbitration pursuant to the contract clause. Plaintiff, relying on *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), argued that the arbitration clause was inapplicable to its securities claim. In *Wilko,* the Court had held that an arbitration clause in a domestic contract could not deprive a securities buyer of his right to the judicial remedy provided in the Securities Act of 1933, since § 14 of the 1933 Act specifically prohibited any "condition, stipulation, or provision" waiving the Act's protection.

A 5–4 majority of the Court declined to apply the *Wilko* holding to the contract in *Scherk.* While *Wilko* had addressed the validity of an arbitration clause in a domestic contract, the Court noted that the agreement in *Scherk* was "truly international", involving "the sale of business enterprises organized under the laws of and primarily situated in European countries, whose activities were largely, if not entirely, directed to European markets". 417 U.S. at 515, 94 S.Ct. at 2455. The Court had held two terms earlier that a forum-selection clause in an international contract would be respected by the United States courts "unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances". *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972). In *Scherk,* the Court observed that "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause".

417 U.S. at 517, 94 S.Ct. at 2456. The Court had already decided that arbitration of the Scherk contract was not "unreasonable".

In reaching this decision, the Court held that a "parochial refusal by the courts of one country to enforce an international arbitration agreement" would not only frustrate the orderly and predictable resolutions that the parties had intended to achieve with their forum-selection clause, but would also invite "mutually destructive jockeying" for advantage. *Id.* at 516–17, 94 S.Ct. at 2455–56. The supposed counterweight to these harmful results—the benefit of having securities claims heard in American courts—was without substance; for if one party resorted to American courts to have arbitration enjoined, "an opposing party [might] by speedy resort to a foreign court block or hinder access to the American court of the purchaser's choice". *Id.* at 518, 94 S.Ct. at 2456.

We have several reasons for finding that *Scherk* does not control the case now before us. We begin by noting that the Court did not rely on the Convention for its decision in *Scherk.* Although it noted the Convention as a factor that "confirmed" the decision, *id.* at 520 n. 15, 94 S.Ct. at 2457 n. 15, it offered no analysis of the "capable of settlement" language of Article II(1).[11] The Court did allude in *Scherk* to the possibility that an award in favor of the defendant might be challenged under Article V(2)(b) of the Convention as contrary to public policy, *id.* at 519 n. 14, 94 S.Ct. at 2457 n. 14, and to that extent it affirmed the existence and importance of a public policy exception under the Convention; but the opinion offered no guidance on the scope of the public policy exception in Article II limiting the *recognition* of certain

agreements as arbitrable and the *reference* of those agreements to arbitration. For this reason, a large portion of the statutory analysis that we have found persuasive in establishing an antitrust exception to arbitration of international contract disputes is unaffected by the Court's decision in *Scherk.*

We do not attempt to make much of the fact that the agreement in *Scherk* was much more "international" than the agreement before us—involving, as it did, the European sale of European trademarks whose validity could only be determined by reference to foreign law. *Id.* at 516 n. 10, 94 S.Ct. at 2456 n. 10. The important point is that the parties here could not be blind to the obvious fact that American law would normally apply to any claim of monopolization or restraint of trade. *See, e.g., United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945) (in which a special panel of the Second Circuit, sitting as a court of last resort, held that the Sherman Act applies to conduct of foreign corporations that has a direct effect on United States commerce); Foreign Trade Antitrust Improvements Act of 1982, Pub.L. No. 97–290, §§ 401–03, 96 Stat. 1233, 1246 (1982) (affirming that both the Sherman Act and the Clayton Act apply to conduct of foreign nationals affecting import trade); Restatement of Foreign Relations Law § 415(1) (Tentative Draft No. 2, 1981) (providing that an agreement in restraint of trade made or predominantly carried out in the United States is subject to U.S. antitrust laws regardless of the nationality or place of business of the participants). Even more apparent is the fact that antitrust law is not a "parochial" consideration. We have already noted that the importance the Unit-

---

11. The court simply stated, "[W]e think that this country's adoption and ratification of the Convention ... provide[s] strongly persuasive evidence of congressional policy consistent with the decision we reach today". 417 U.S. at 521 n. 15, 94 S.Ct. at 2458 n. 15. This language prompted the following comment by A. Jason Mirabito, *The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards: The First Four Years,* 5 Ga.J. Int'l. & Comp.L. 471, 498 (1975): "Thus, the

Court basically ignored the Convention and enforced the agreement to arbitrate on other grounds". *See also* Comment, *Greater Certainty in International Transactions Through Choice of Forum?,* 69 Am.J. Int'l L. 366, 371 (1975), observing that in *Scherk* the Court had not addressed the provisions of private international law and the Convention that "permit the courts of one state to refuse to enforce an agreement to arbitrate which is void because contrary to the public policy of that state".

ed States accords its antitrust laws is well known, and that our insistence on a judicial forum for antitrust claims in international agreements has a precedent in the laws of Germany. *See supra* at note 8 and accompanying text. In view of these considerations, we cannot imagine that our invoking the public policy exception of the Convention to preserve antitrust claims from arbitration will promote "jockeying" for forums or invite retribution from foreign courts.

Perhaps the major difference between *Scherk* and the case at hand lies in the different policies at issue. In *Wilko,* the Court observed that the securities laws were "[d]esigned to protect investors", 346 U.S. at 431, 74 S.Ct. at 184, and that arbitration clauses impermissibly deprive investors of this protection by restricting the "wider choice of courts and venue" provided by the securities laws. *Id.* at 435, 74 S.Ct. at 186. The Court declined in *Scherk* to extend this reasoning to international contracts: first, because it found that the private investor's ability to choose an American judicial forum at the time the dispute arose was illusory, since the other party could block the forum choice in a foreign court; and second, because it found that the private investor's interest in choosing his forum ahead of time was greater in an international contract, where the forum and substantive law that would govern any specific dispute absent an arbitration clause were so uncertain. 471 U.S. at 516–18, 94 S.Ct. at 2455–56. In short, the Court engaged in a balancing test, weighing the policy considerations of giving the investor the full protection of the securities laws against the policy considerations of giving the investor the certainty of an arbitration clause; and it decided that the individual investor would be better served by enforcement of the arbitration clause.

The policy underlying the antitrust laws, however, is not to protect individual companies, but to protect *competition.* In *Ameri-*

*can Safety Equipment,* the Second Circuit observed:

"A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest [citations omitted]. Antitrust violations can affect hundreds of thousands—perhaps millions—of people and inflict staggering economic damage .... We do not believe that Congress intended such claims to be resolved elsewhere than in the courts". 391 F.2d at 826–27.

Although it is true that an investor like Scherk who brings an action under the securities laws serves the public interest by policing the securities market, the securities laws are designed primarily to protect a fairly small "special interest" group: those investors in a particular security who read and are influenced by information in the company's prospectuses or financial reports. Antitrust laws, on the other hand, protect the general public by preserving a competitive atmosphere that keeps prices down in an entire industry or in a group of related industries. The strength of the public interest in private enforcement of antitrust laws is illustrated by the fact that successful antitrust plaintiffs are allowed to recover treble damages, while securities plaintiffs may only recover their actual damages. If we engage in a *Scherk*-type balancing exercise, therefore, we must weigh the private party's interest in the arbitration of international contract disputes against the public's interest in the preservation of economic order in the United States. Such a balancing exercise can have only one result: to enforce the private arbitration clause at the expense of public policy would be "unreasonable".[12] *Cf. Zapata,* 407 U.S. at 10, 92 S.Ct. at 1913.

---

**12.** We speak here, as we have throughout this opinion, only of the enforcement of a *prospective* arbitration clause affecting an antitrust claim. We express no opinion on the question whether the parties can agree to arbitrate a specific antitrust claim once the dispute has arisen, a practice that some courts have likened to the settlement of a private antitrust suit.

### C. Implications for the District Court

Appellant has argued briefly that, since the antitrust issues "permeate" the claims in arbitration, the arbitration proceedings should be stayed. *Applied Digital Technology, Inc. v. Continental Casualty Co.,* 576 F.2d 116 (7th Cir.1978); *Cobb v. Lewis,* 488 F.2d 41 (5th Cir.1974). Appellee counters with *Kelly v. Kosuga,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), and *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045 (5th Cir.1982). The district court, however, has not had the occasion to decide whether the matters are sufficiently separable to justify separate and contemporaneous treatment. Moreover, the district court has not, because of its application of *Scherk* to this case, been called upon to assess the likelihood of success of the antitrust claims, a relevant factor in deciding whether or not to stay arbitration. *See N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.,* 532 F.2d 874 (2d Cir.1976). Such cases as *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025 (2d Cir.1979), *Continental T.V. Inc. v. G.T.E. Sylvania Inc.,* 694 F.2d 1132 (9th Cir.1982), and our own *Auburn News Company, Inc. v. Providence Journal Co.,* 659 F.2d 273 (1st Cir. 1981), may be relevant. *See also* American Bar Association Section of Antitrust Law, Monograph 9, *Refusals to Deal and Exclusive Distributorships,* at 28 n. 110.

The district court may now, in the light of our holding that Soler's antitrust claims against Mitsubishi are not arbitrable, focus on such matters as permeation and likelihood of success and decide whether both arbitrable and nonarbitrable matters should proceed on their own course or whether one set of problems should await resolution of the other. For example, the claim that Mitsubishi had "good cause" to terminate its dealership arrangement with Soler is part of Mitsubishi's case in chief, which will be submitted to arbitration. If the district court believes that Soler's antitrust claims are separable and that the interests of judicial economy would be served by staying a determination of these claims pending arbitration, it will be able to allow the arbiter to make an initial determination on the "good cause" issue. If the arbiter finds that good cause existed, the district court may not need to reach the antitrust issues; if the arbiter finds that Mitsubishi did not have good cause to terminate the contract, the district court may then need to decide whether the termination was caused by a violation of the antitrust laws. We leave the method of decision, including specifically whether or not to entertain further evidence and/or argument, to the district court.

*The judgment of the district court submitting Soler's antitrust claims to arbitration is reversed; as to all other issues, the judgment of the district court is affirmed. The case is remanded for further proceedings in accordance with this opinion. Appellee to receive half its costs.*