391 F.2d 821
 AMERICAN SAFETY EQUIPMENT CORP., Plaintiff-Appellant,
v.
J. P. MAGUIRE & CO., Inc., a Delaware Corporation, Defendant-Appellee.
AMERICAN SAFETY EQUIPMENT CORP., Plaintiff-Appellant,
v.
HICKOK MANUFACTURING CO., Inc., Defendant-Appellee.
 No. 166.
 No. 189.
 Docket 31658.
 Docket 31709.
 United States Court of Appeals Second Circuit.
 Argued November 22, 1967.
 Decided March 20, 1968.
 
 William W. Owens, New York City (Royall, Koegel, Rogers & Wells, Joseph H. Spain, New York City, on the brief), for plaintiff-appellant.
 Julius J. Abeson, New York City (Hahn, Hessen, Margolis & Ryan, Jules J. L. Hessen, Melvin Beinart, New York City, on the brief), for defendant-appellee, J. P. Maguire & Co., Inc.
 Leo Guzik, New York City (Guzik & Boukstein, New York City, on the brief), for defendant-appellee, Hickok Mfg. Co., Inc.
 Before LUMBARD, Chief Judge, and KAUFMAN and FEINBERG, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 These two appeals by American Safety Equipment Corp. (ASE) are from orders of the United States District Court for the Southern District of New York, Constance B. Motley, J., which stayed, pending arbitration, two declaratory judgment actions by ASE, one against Hickok Manufacturing Co., Inc., and the other against J. P. Maguire & Co., Inc. The merits of these actions are not now directly in question, but the propriety of directing arbitration is. We conclude that the court should have decided itself at least some of the issues it referred to the arbitrators. Accordingly, we remand for further proceedings.
 
 
 2
 In August 1963, ASE and Hickok entered into a License Agreement under which Hickok granted to ASE an exclusive license to use the "Hickok" trademarks in connection with "safety protective devices" and "accessories."[1] The former were principally seat belts; the latter were defined as anything intended for use in a vehicle provided it was not a safety protective device or a regular body or motor part. Several substantive elements of the License Agreement, which had a fifteen year term,[2] are relevant here. Paragraph 3 provided for royalties based on ASE's total annual sales of safety protective devices (whether or not the Hickok trademarks were used) and of accessories (if sold under trademark). Paragraph 27 allowed ASE to grant sublicenses for territories outside the United States, subject to approval by Hickok, if certain conditions were met; the most important of these was that the sublicensee could not be "a competitor of Hickok or of any of its licensees with respect to any products sold or dealt with by said proposed sublicensee." Among Hickok's products are trouser belts, suspenders, a variety of gift items for men, and several types of men's wearing apparel. Paragraph 28 limited each company to its own field of activity; Hickok would neither sell nor market safety protective devices or accessories, and ASE would "not directly or indirectly engage in the business of manufacturing, selling or dealing with any items or types of items of wearing apparel, apparel accessories and gift sets, other than sets related to transportation." Three other provisions of the License Agreement are also relevant: One allowed assignment only with the consent of the other party; another contained a standard severability clause, and the third provided:
 
 
 3
 All controversies, disputes and claims of whatsoever nature and description arising out of, or relating to, this Agreement and the performance or breach thereof, shall be settled by arbitration * * *.
 
 
 4
 The 1963 License and Manufacturing Agreements[3] extended a business relationship which had started in 1959. Under the agreements, operations apparently continued on a mutually satisfactory basis for several more years, during which time ASE and Hickok did many millions of dollars worth of business together. But, as so frequently occurs, there was a falling out. On October 21, 1966, ASE filed a complaint against Hickok in the district court seeking a declaratory judgment that the License Agreement was illegal and void ab initio and that no royalty obligations had or would accrue under it. The complaint alleged that paragraphs 3, 27 and 28 of the agreement violated the Sherman Act because they unlawfully extended Hickok's trademark monopoly and unreasonably restricted ASE's business.[4] Twelve days later, J. P. Maguire & Co., Inc., claiming to be the assignee of Hickok's royalty rights, invoked the arbitration clause quoted above and demanded arbitration of a claim to $321,000.25 for royalties due under the License Agreement. In response, ASE filed another declaratory judgment action, this time against Maguire. This complaint repeated the claim for relief already made against Hickok; in addition, it sought an injunction against the arbitration proceeding commenced by Maguire. The grounds urged were: (1) that the License Agreement was illegal because of antitrust violations, and that the district court had exclusive jurisdiction to determine that illegality; and (2) that Maguire had no right to demand arbitration under the License Agreement because the purported assignment by Hickok was invalid. Subsequently, ASE sought a preliminary injunction; Maguire, in turn, moved under the United States Arbitration Act, 9 U.S.C. §§ 2-4, 6, to stay the declaratory judgment action against it, pending arbitration of all issues. A similar procedural position was reached in ASE's action against Hickok. In December, Hickok formally abandoned all rights to enforce the challenged provisions of paragraph 28 of the License Agreement. A month later, Hickok demanded that ASE arbitrate all issues relating to the License Agreement, and moved to stay ASE's declaratory judgment action pending that arbitration; ASE countered with a motion for a preliminary injunction against that arbitration also.
 
 
 5
 The two sets of motions growing out of this procedural morass were heard in February 1967. Thereafter, Judge Motley denied ASE's motions to enjoin arbitration and granted the motions of Maguire and Hickok. The judge held that the arbitration clause was broad enough to encompass the claims of antitrust violations and found no public policy against referring them to arbitration; the validity of the assignment would also be resolved in that forum. Accordingly, the judge stayed ASE's two declaratory judgment actions pending arbitration, and directed arbitration with respect to "all claims, disputes and controversies between the parties relating to the License Agreement, including the issue as to the validity thereof."
 
 
 6
 The basic question we must resolve is whether the district court erred in staying ASE's actions and ordering arbitration of ASE's antitrust allegations.[5] Before reaching it, however, we must determine whether these orders are properly before us at all, i. e., whether they are appealable. That issue was not initially noticed by the parties; we brought it to their attention, however, and they subsequently submitted briefs on the matter. A very recent case in this circuit, Standard Chlorine, Inc. v. Leonard, 384 F.2d 304 (2d Cir. 1967), is dispositive of the law to be applied. As we stated there, adopting the Fifth Circuit's formulation, id. at 308:
 
 
 7
 An order staying or refusing to stay proceedings in the District Court is appealable under § 1292(a) (1) only if (A) the action in which the order was made is an action which, before the fusion of law and equity, was by its nature an action at law; and (B) the stay was sought to permit the prior determination of some equitable defense or counterclaim.
 
 
 8
 The second requirement has clearly been met here; setting up the arbitration agreement is itself an equitable defense. Id.; see Shanferoke Coal & Supply Corp. of Delaware v. Westchester Service Corp., 293 U.S. 449, 452, 55 S.Ct. 313, 79 L.Ed. 583 (1935).
 
 
 9
 Whether the first requirement has been fulfilled is more complicated. A declaratory judgment action is a statutory creation, and by its nature is neither fish nor fowl, neither legal nor equitable. Where, as here, such an action has required classification, the courts have looked to the basic nature of the suit in which the issues involved would have arisen if Congress had not created the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. E. g., Simler v. Conner, 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963); Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 504, 515, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); see Wright, Federal Courts § 100, at 392-93 (1963). Were it not for the availability of declaratory relief, the dispute between ASE and Hickok would normally arise in one of two ways. ASE could bring an action for treble damages based upon the alleged antitrust violations. On the other hand, ASE could wait until Hickok attempted to collect outstanding royalties, and then assert the illegality of the agreement as a defense. In either instance, the action would be legal, not equitable. See Beacon Theatres, Inc. v. Westover, supra; Ring v. Spina, 166 F.2d 546 (2d Cir.), cert. denied, 335 U.S. 813, 69 S.Ct. 30, 93 L.Ed. 368 (1948). Since the basic nature of ASE's declaratory judgment action against Hickok is thus legal, the conditions set forth in Standard Chlorine are met, and the appeal will lie.[6]
 
 
 10
 As to Maguire, it asserts that ASE's demand for an injunction in its declaratory judgment complaint shows that the basic nature of the proceeding is equitable. This argument might be persuasive if the action against Maguire were analyzed in isolation; a suit to enjoin pending arbitration proceedings, coupled with a claim for declaratory relief, has a pronounced equitable cast. See Greenstein v. National Skirt & Sportswear Ass'n, 274 F.2d 430 (2d Cir. 1960); Wilson Bros. v. Textile Workers Union, 224 F.2d 176 (2d Cir.), cert. denied, 350 U.S. 834, 76 S.Ct. 70, 100 L.Ed. 745 (1955). However, the action against Maguire is not in a vacuum; it is, instead, an integral part of the dispute between ASE and Hickok, including ASE's declaratory judgment action against Hickok. ASE sought to enjoin the arbitration that Maguire had already commenced merely as an adjunct to ASE's second declaratory judgment action, which stated the basic issues of the controversy between all three parties. Thus, we conclude that the Maguire order is also appealable. We are not gratified that this exercise in following convoluted case law is necessary, but we are heartened that the result reached is desired by both ASE and Hickow, the original major principals.
 
 
 11
 We now come to the merits of the district court orders, which stayed the declaratory judgment actions and required ASE to proceed to arbitration on all disputes with Hickok and Maguire, including the validity of the License Agreement. The basic issue was aptly phrased by this court fifteen years ago in Wilko v. Swan, 201 F.2d 439, 444 (2d Cir. 1953):
 
 
 12
 We think that the remedy a statute provides for violation of the statutory right it creates may be sought not only in any "court of competent jurisdiction" but also in any other competent tribunal, such as arbitration, unless the right itself is of a character inappropriate for enforcement by arbitration * * *.
 
 
 13
 The question before us is whether the statutory right ASE seeks to enforce is "of a character inappropriate for enforcement by arbitration." This is a difficult issue, not often litigated. Wilko v. Swan, supra, was reversed by the Supreme Court in the leading decision on this subject. 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). In that case, a purchaser of securities brought an action under the Securities Act of 1933; he had signed a margin agreement which provided for arbitration of any controversy between the customer and the brokerage firm. The question was whether plaintiff was required to submit his claim to arbitration. This court held (2-1) that he was. The Supreme Court reversed (7-2), construing the non-waiver provision in the Securities Act[7] to forbid bargaining away any rights under the Act, including choice of forum.
 
 
 14
 We have recently considered a similar problem in Fallick v. Kehr, 369 F.2d 899 (2d Cir. 1966). In that case, one partner, invoking the arbitration clause in a partnership agreement, charged another partner with misappropriation of partnership funds. A key issue was whether the latter's discharge in bankruptcy barred this claim. The district court, in the exercise of its discretion, allowed this issue, along with the others in the dispute, to be submitted to arbitration. We held (2-1) that this was not an abuse of discretion. But see I. O. Koven & Brother, Inc. v. Local Union No. 5767, United Steelworkers of America, 381 F.2d 196, 200-205 (3d Cir. 1967).
 
 
 15
 None of these decisions involved the arbitrability of an antitrust claim; a few cases, however, do consider the question. In Silvercup Bakers, Inc. v. Fink Baking Corp., 273 F.Supp. 159, 162-163 (S.D.N. Y.1967), the court in dictum characterized as "persuasive" the view that courts should not be displaced by labor arbitrators in deciding antitrust suits. A similar view was expressed in the context of a commercial dispute in Fanchon & Marco, Inc. v. Paramount Pictures, Inc., 107 F.Supp. 532, 548 (S.D.N.Y.1952) (dictum), rev'd on other grounds, 202 F. 2d 731, 36 A.L.R.2d 1336 (2d Cir. 1953). See also Standardbred Owners Ass'n v. Yonkers Raceway, Inc., 31 Misc.2d 474, 220 N.Y.S.2d 649 (1961); cf. American President Lines, Ltd. v. S. Woolman, Inc., 239 F.Supp. 833, 836 (S.D.N.Y.1964). However, in Greenstein v. National Skirt & Sportswear Ass'n, 178 F.Supp. 681 (S. D.N.Y.1959), appeal dismissed, 274 F.2d 430 (2d Cir. 1960), the court refused to stay an arbitration under a collective bargaining agreement even though plaintiff manufacturers, among other things, claimed that the agreement violated the Sherman Act.[8] There are other decisions at the periphery of the precise issue before us. Thus, Kingswood Management Corp. v. Salzman, 272 App.Div. 328, 70 N.Y.S.2d 692 (1947), held treble damage claims for rent overcharges under the Emergency Price Control Act of 1942 non-arbitrable. But in United States for Use and Benefit of Capolino Sons, Inc. v. Electronic & Missile Facilities, Inc., 364 F.2d 705 (2d Cir.), dismissed under Rule 60, 385 U.S. 924, 87 S.Ct. 239, 17 L. Ed.2d 148 (1966), arbitration was ordered on a Miller Act claim. Cf. Moseley v. Electronic & Missile Facilities, Inc., 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963). And Evans v. Hudson Coal Co., 165 F.2d 970 (3d Cir. 1948), approved arbitration of a claim under the Fair Labor Standards Act. These and other analogous opinions are cited in the decisions at various judicial levels in Wilko v. Swan and Fallick v. Kehr.[9]
 
 
 16
 Although these cases are relevant, they are not determinative. Nor are the two decisions relied on by the court below: Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), and Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir. 1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed under Rule 60, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960). It is true that in Prima Paint the Court said (388 U.S. at 404, 87 S.Ct. at 1806):
 
 
 17
 in passing upon a [9 U.S.C.] § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate.
 
 
 18
 But we do not read that as foreclosing the inquiry in which we are engaged any more than it did the Supreme Court in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). The claim in both Prima Paint and Robert Lawrence was that a contract containing an arbitration clause was void because the contract as a whole was induced by fraud. In each case it was held that fraud in the inception was a question which could be decided by arbitrators, unless the claim of fraud went specifically to the arbitration clause. On the other hand, the claim here is that the contract is void because of a federal statue. In other words, there was not present in Prima Paint and Robert Lawrence that clash of competing fundamental policies which we find in this case and in most of those referred to above: the conflict between federal statutory protection of a large segment of the public, frequently in an inferior bargaining position, and encouragement of arbitration as a "prompt, economical and adequate solution of controversies." See Wilko v. Swan, 346 U.S. at 438, 74 S.Ct. 182. In that case, the Supreme Court frankly recognized a similar collision of public policies and faced up to it; we must do no less here.
 
 
 19
 A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his rights under the Act has been likened to a private attorney-general who protects the public's interest. See Waldron v. Cities Service Co., 361 F.2d 671, 673 (2d Cir. 1966), cert. granted, 385 U.S. 1024, 87 S.Ct. 743, 17 L.Ed.2d 672 (1967). Antitrust violations can affect hundreds of thousands — perhaps millions — of people and inflict staggering economic damage. Thus, in the recent "electrical equipment" cases, there were over 1,900 actions, including over 25,000 separate damage claims, commenced by purchasers of equipment allegedly illegally overpriced.[10] The purchasers in turn sold electricity to millions of consumers at rates presumably increased by the excessive costs.[11] We do not believe that Congress intended such claims to be resolved elsewhere than in the courts. We do not suggest that all antitrust litigations attain these swollen proportions; the courts, no less than the public, are thankful that they do not. But in fashioning a rule to govern the arbitrability of antitrust claims, we must consider the rule's potential effect. For the same reason, it is also proper to ask whether contracts of adhesion between alleged monopolists and their customers should determine the forum for trying antitrust violations. Here again, we think that Congress would hardly have intended that. It is true that in Fallick v. Kehr, 369 F.2d at 905, when a similar argument was made to us, we said that we would deal with such a case when we had it. But in that situation Congress had clearly allowed the issue of dischargeability to be determined outside of the bankruptcy court, the Supreme Court had instructed bankruptcy courts to enjoin a claim against a discharged bankrupt only if there were "unusual circumstances," the agreement to arbitrate was part of a contract that was the opposite of a contract of adhesion, the crucial issue to be arbitrated was a relatively simple one, and the partnership agreement was perfectly proper when made.
 
 
 20
 On the other hand, the claim here is that the agreement itself was an instrument of illegality; in addition, the issues in antitrust cases are prone to be complicated, and the evidence extensive and diverse, far better suited to judicial than to arbitration procedures. Moreover, it is the business community generally that is regulated by the antitrust laws. Since commercial arbitrators are frequently men drawn for their business expertise, it hardly seems proper for them to determine these issues of great public interest. As Judge Clark said concerning the analogous situation in Wilko v. Swan, 201 F. 2d at 445 (dissenting opinion):
 
 
 21
 Adjudication by such arbitrators may, indeed, provide a business solution of the problem if that is the real desire; but it is surely not a way of assuring the customer that objective and sympathetic consideration of his claim which is envisaged by the Securities Act.
 
 
 22
 Appellee Hickok seems to argue that all these considerations are irrelevant because ASE does not seek damages, apparently conceding that a treble damage claim would not be arbitrable. We do not regard this distinction as significant if it is meant to persuade us that arbitrators rather than courts should declare whether contract provisions violate the Sherman Act. On the other hand, if Hickok is merely emphasizing that ASE's antitrust claims are actually being asserted as a defense to an action for royalties, we agree that questions of separability are present here, and we refer to them below. However, the problem of which forum should determine those questions remains; we believe it is governed by the same considerations discussed above.
 
 
 23
 We express no general distrust of arbitrators or arbitration; our decisions reflect exactly the contrary point of view. See, e. g., South East Atl. Shipping Ltd. v. Garnac Grain Co., 356 F.2d 189, 192-193 (2d Cir. 1966) (appellant penalized for making frivolous attempt to overturn arbitration award); Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 126 F.2d 978, 985 (2d Cir. 1942) ("it is our obligation to shake off the old judicial hostility to arbitration"). Moreover, we do not deal here with an agreement to arbitrate made after a controversy has already arisen. Cf. Wilko v. Swan, 346 U.S. at 438, 74 S.Ct. 182. We conclude only that the pervasive public interest in enforcement of the antitrust laws, and the nature of the claims that arise in such cases, combine to make the outcome here clear. In some situations Congress has allowed parties to obtain the advantages of arbitration if they "are willing to accept less certainty of legally correct adjustment," see id., but we do not think that this is one of them. In short, we conclude that the antitrust claims raised here are inappropriate for arbitration.
 
 
 24
 This does not mean that we rule out arbitration of all aspects of this dispute. It does mean that the district court erred in submitting to the arbitrators "the issue as to the validity" of the License Agreement insofar as that empowered the arbitrators to decide issues of antitrust law. A plethora of those were raised by the able briefs and argument. Appellant contends that each of three separate sections of the License Agreement violates the Sherman Act. Appellees deny this, and make the following additional arguments, among others: Even if invalid, two of the sections are severable and therefore do not vitiate the rest of the agreement; at least one of the alleged claims of illegality is moot because Hickok has irrevocably disclaimed any intention of enforcing the section; and, finally, appellant is estopped from challenging the validity of the agreement, having retained certain patents and other benefits from it. We do not, of course, express any view on the merits of these arguments. But we do note that ASE's claims are not frivolous, and that some of the opposing contentions raise difficult and fundamental questions; e. g., can the antitrust violations be a defense to a claim for royalties already due on goods sold by ASE under the Hickok trademark? Cf. Kelly v. Kosuga, 358 U.S. 516, 79 S. Ct. 429, 3 L.Ed.2d 475 (1959); American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 87 S. Ct. 1, 17 L.Ed.2d 37 (1966) (granting stay); Comment, 27 U.Chi.L.Rev. 758 (1960).[12] If such violations are not a defense, the arbitration might promptly proceed within defined limits, leaving it to the arbitrators to decide what goods were so sold. However, the district court, rather than ruling on these several contentions, held that they should all be decided by arbitrators. In that it erred; the antitrust claims pressed by appellant may not be submitted to arbitration. The district court should, in the first instance and with appropriate expedition, see Fed.R.Civ.P. 57, determine so much of this case as may be necessary in order that in the arbitration, if there is one, of the claims under the License Agreement, the arbitrators will not be called upon to determine antitrust issues. Cf. Ring v. Spina, 148 F.2d 647 (2d Cir. 1945).
 
 
 25
 The district court also left for arbitration the question whether Maguire had the right to invoke the arbitration clause against ASE. ASE asserts that it made no agreement to arbitrate with Maguire and therefore cannot be compelled to do so. It argues that the License Agreement itself invalidates the purported assignment from Hickok to Maguire,[13] and that even if the assignment is valid, it transfers only the right to receive royalties, not the right to demand arbitration. Maguire replies that the License Agreement prohibits assignments (without ASE's consent) only of the whole contract, that even if this assignment falls within the prohibition of the agreement, the clause is only a personal covenant between ASE and Hickok, and does not affect Maguire's claims, that an assignment of royalties does carry with it the right to demand arbitration, and, finally, that ASE is foreclosed from relying on the anti-assignment clause because of laches, waiver and estoppel. Whether Maguire can compel ASE to arbitrate is an issue to be decided in the courts. See John Wiley & Sons v. Livingston, 376 U. S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Import Export Steel Corp. v. Mississippi Valley Barge Line Co., 351 F.2d 503 (2d Cir. 1965); Nederlandse Erts-Tankersmaatschappij, N. V. v. Isbrandtsen Co., 339 F.2d 440 (2d Cir. 1964); cf. Orion Shipping & Trading Co. v. Eastern States Petroleum Corp. of Panama, S. A., 312 F.2d 299 (2d Cir.), cert. denied, 373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed.2d 705 (1963).
 
 
 26
 This case is quite different from those involving fraud in the inducement, e. g., Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir. 1959), cert. granted, 362 U. S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed under Rule 60, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960). In those cases, an agreement to arbitrate was reached by the parties; the fraud alleged went not to the agreement to arbitrate but to the substance of the contract. The arbitration clauses were held separable, and the issue of fraud in the inducement was sent to arbitration. That approach is not available here; it accomplishes nothing to treat the arbitration clause separately if Maguire is not a party to it. Therefore, before ordering ASE to arbitration, the district court should have first determined whether there was an agreement to arbitrate between ASE and Maguire. We express no opinion on the merits of that issue.
 
 
 27
 Finally, we note that nothing said in the course of this opinion is meant to preclude the district court, after deciding the questions now before it, from exercising its discretion in overseeing further development of these proceedings. See the three decisions of this court in Nederlandse Erts-Tankersmaatschappij, N. V. v. Isbrandtsen Co., 339 F.2d 440 (2d Cir. 1964), 362 F.2d 205 (2d Cir. 1966), and 387 F.2d 954 (2d Cir. 1968).
 
 
 28
 Remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 There was also a contemporaneous Manufacturing Agreement under which Hickok agreed to manufacture seat belts for ASE. Various claims under the Manufacturing Agreement between the two parties and Maguire, as purported assignee of Hickok's royalty rights, had, at the time of the district court proceedings, been submitted to arbitration. None of the parties has raised any question in this proceeding concerning either that agreement or that arbitration
 
 
 [2]
 This was later changed to sixteen years
 
 
 [3]
 See note 1 supra
 
 
 [4]
 A fourth allegation, that the term of the License Agreement was unreasonably long, has apparently been withdrawn
 
 
 [5]
 The arbitrability of the validity of the assignment to Maguire is also before us, and is discussed below
 
 
 [6]
 To support appealability, ASE also points out that if it had not filed a declaratory action, Hickok might have brought an action under 9 U.S.C. § 4 to compel ASE to arbitrate with it. If the district court had ordered arbitration over ASE's objections, as it has, ASE would have had a right to appeal under 28 U.S.C. § 1291. E. g., Rochester Tel. Corp. v. Communication Workers of America, 340 F.2d 237 (2d Cir. 1965) (per curiam); Farr & Co. v. Cia. Intercontinental De Navigacion De Cuba, S. A., 243 F.2d 342, 344-345 (2d Cir. 1957)
 
 
 [7]
 § 14, 15 U.S.C. § 77n
 
 
 [8]
 The defendants had stipulated, however, that if arbitration resulted in an award against plaintiffs, the award could be attacked "upon any application for its confirmation on the ground of illegality of the contract provisions." 178 F.Supp. at 690
 
 
 [9]
 Wilko v. Swan, 201 F.2d at 443-445, and 346 U.S. at 435 nn. 20, 21, 74 S.Ct. 182; Fallick v. Kehr, 369 F.2d at 904 and n. 11, and at 906 (Friendly, J., dissenting)
 
 
 [10]
 Reports of the Proceedings of the Judicial Conference of the United States (Washington, D. C., March 10-11, 1966) 25 (1966)
 
 
 [11]
 See generally Atlantic City Elec. Co. v. General Elec. Co., 226 F.Supp. 59 (S. D.N.Y.1964); Ohio Valley Elec. Corp. v. General Elec. Co., 244 F.Supp. 914, 949-951 (S.D.N.Y.1965)
 
 
 [12]
 This question is made more difficult by the fact that inKelly, allowing the defense would have permitted the buyers to retain goods without paying for them, while under the License Agreement involved here, only the less tangible benefits of using Hickok's trademarks have been received by ASE. It is for the district court to decide whether that is a distinction without a difference.
 
 
 [13]
 Section 26(a) of the License Agreement provides:
 This Agreement and the license granted thereunder may not be assigned, transferred or encumbered by either party without the consent or approval of the other * * *.