803 F.2d 157
 55 USLW 2316, Fed. Sec. L. Rep. P 93,007,
RICO Bus.Disp.Guide 6437
 MAYAJA, INC., S.A. Orart, Elias Sheinberg, and Marcia
Sheinberg, Plaintiffs- Appellees,
v.
Joseph F. BODKIN, Nicholas S. Bustamante, and Shearson
Lehman Brothers, Inc., Defendants-Appellants.
 No. 85-2762.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 24, 1986.
 
 William D. Sims, Jr., Jenkens & Gilchrist, Will S. Montgomery, Dallas, Tex., for defendants-appellants.
 Charles B. Gorham, Charles R. Shaddox, San Antonio, Tex., for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Texas.
 Before GEE, RANDALL and DAVIS, Circuit Judges.
 RANDALL, Circuit Judge:
 
 I.
 
 1
 In July of 1985, plaintiffs Mayaja, Inc. (Mayaja), Orart S.A. Texas, Inc. (Orart), and Elias and Marcia Sheinberg brought suit against defendants based upon a series of transactions involving their financial management and commodity accounts with defendant Shearson Lehman Brothers, Inc. (Shearson). Both Mayaja and Orart are closely-held private corporations whose officers and directors are members of the Sheinbergs' family. Mayaja and Orart allege that defendant Bustamante, the manager of their discretionary commodity accounts with Shearson, conducted a number of unauthorized transactions on the accounts with the complicity of his supervisor, defendant Bodkin, resulting in staggering losses. The Sheinbergs allege that Bustamante forged their signatures and withdrew money from their financial management account in order to meet margin calls on the commodity accounts of Mayaja and Orart. The plaintiffs assert against defendants claims of securities fraud under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 of the Securities and Exchange Commission. Plaintiffs also assert civil RICO claims based upon predicate acts of mail and wire fraud, in violation of 18 U.S.C. Secs. 1341 and 1343, as well as upon the acts of securities fraud independently asserted.[1]
 
 
 2
 Defendants responded to the complaint with a motion to compel arbitration. Plaintiffs had agreed to arbitrate "any controversy arising out of or relating to [their] accounts, to transactions with [Shearson] ... or to [their] agreement[s] or the breach thereof" when they signed their respective agreements.[2] The defendants argued that the Supreme Court's decisions in Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), and in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., --- U.S. ----, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), implicitly overruled established precedent in this circuit holding that securities fraud claims under the 1934 Act are not arbitrable. E.g., Sibley v. Tandy Corp., 543 F.2d 540 (5th Cir.1976), cert. denied, 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977). Defendants also asserted that these same Supreme Court decisions argue for the arbitrability of the RICO claims.
 
 
 3
 The district court found that the Court's opinions specifically declined to address the question of the arbitrability of 1934 Act claims. Holding that Justice White's suggestion that 1934 Act claims may be arbitrable, contained in his concurring opinion in Byrd, was insufficient to overcome established precedent in this circuit, the court below denied the motion to compel arbitration.
 
 
 4
 On appeal of the order denying the motion to compel arbitration,[3] we affirm in part and reverse in part.
 
 II.
 
 5
 This appeal presents the question of whether, under the Federal Arbitration Act, 9 U.S.C. Secs. 1-14, plaintiffs' securities fraud and RICO claims must be submitted to arbitration. Like any decision whether to order arbitration under the Act, the inquiry in this case divides into two broad parts: first, did the parties agree to arbitrate the disputes in question, and, second, did Congress intend that the claims sub judice be arbitrable? See Mitsubishi, 105 S.Ct. at 3354, 3355. Accordingly, we first examine whether plaintiffs' arbitration agreements encompass the statutory claims asserted; in Part III we consider the arbitrability of these claims.
 
 
 6
 As a preliminary matter, we note that the contracts before us involve "commerce" within sections 1 and 2 of the Act sufficient to bring sections 3 and 4 of the Act into play. Agreements to transact in commodities futures without question involve interstate "commerce" as that term is defined in section 1,[4] and an agreement to transact in securities is no less interstate in nature. Having determined the applicability of the Arbitration Act to the instant proceeding, we now pause to consider whether "the issue involved in [this] suit or proceeding is referable to arbitration under such an agreement." 9 U.S.C. Sec. 3.
 
 
 7
 We find that the arbitration clauses before us encompass the claims asserted in this dispute. Both the 1934 Act claims and the RICO claims "aris[e] out of or relat[e] to" the plaintiffs' accounts or transactions with Shearson: the securities fraud allegations and the other acts predicate to the RICO claim all derive from Shearson's handling of the plaintiffs' accounts or from transactions on those accounts made by Shearson's agents. Bearing in mind the federal policy that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-42, 74 L.Ed.2d 765 (1983), we find it clear that the parties agreed to arbitrate these claims. Cf. Mitsubishi, 105 S.Ct. at 3353 n. 13 (construing more restrictive arbitration clause as encompassing arbitration of antitrust claims). We now turn to consider whether plaintiffs' 1934 Act and RICO claims are nonarbitrable even though they have agreed to arbitrate them.
 
 III.
 
 8
 In order for a statutory claim to overcome the overriding federal policy in favor of arbitration, Moses H. Cone, 460 U.S. at 24-25, 103 S.Ct. at 941-42, it is necessary that the party opposing the motion to compel produce evidence that Congress intended the statutory claim to be non-arbitrable. See Mitsubishi, 105 S.Ct. at 3355. A mere absence of evidence that Congress intended the claims to be arbitrable is insufficient to overcome the presumption in favor of arbitrability; the party opposing the motion must show that Congress intended to make an exception to the Arbitration Act of the statutory claim in question. As the Supreme Court instructed in its Mitsubishi opinion:
 
 
 9
 Just as it is the congressional policy manifested in the federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by that Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable.... We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history.
 
 
 10
 Id.
 
 
 11
 Thus, the task of a court in determining the arbitrability of a claim under the Federal Arbitration Act is, first, to examine the relevant statutory text and legislative history for express evidence that Congress intended the statutory claim concerned to be non-arbitrable. In many cases Congress may not have explicitly addressed the arbitrability question. In this event, the court must carefully examine the congressional policies prompting the enactment of the cause of action to determine whether, in light of these policies, an implicit congressional intention that the claims under the statute not be subjected to arbitration may be inferred due to the inability of these policies to be furthered if the claims are subject to arbitration. See Mitsubishi, 105 S.Ct. at 3357-59 (examining, in the absence of an explicit statement of congressional intent as to arbitrability, congressional policies behind Sec. 4 of the Clayton Act); cf. McDonald v. City of West Branch, 466 U.S. 284, 104 S.Ct. 1799, 1803-04, 80 L.Ed.2d 302 (1984) (basing finding of congressional intent that Sec. 1983 claims be non-arbitrable upon conflict between arbitration and Sec. 1983's objectives); Barrentine v. Arkansas-Best Freight Sys., 450 U.S. 728, 740-45, 101 S.Ct. 1437, 1444-47, 67 L.Ed.2d 641 (1981) (finding congressional intent that FLSA claims be non-arbitrable because of conflict between arbitration and FLSA's purposes); Alexander v. Garner-Denver Co., 415 U.S. 36, 56, 94 S.Ct. 1011, 1023, 39 L.Ed.2d 147 (1974) ("The purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII; deferral to arbitral decisions would be inconsistent with that goal.").
 
 
 12
 With these rules of statutory interpretation in mind, we turn to the questions of whether Congress intended that 1934 Act and private RICO claims be litigated in factual settings similar to that of the case before us.
 
 A.
 
 13
 This court has on many occasions addressed the question of the arbitrability of 1934 Act claims, and consistently held that Congress intended these claims to be non-arbitrable. See, e.g., Bustamante v. Rotan Mosle, Inc., 802 F.2d 815, 816, (5th Cir.1986); Smoky Greenhaw Cotton Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 785 F.2d 1274, 1275 n. 1 (5th Cir.1986); Sawyer v. Raymond, James & Assocs., Inc., 642 F.2d 791, 792 (5th Cir. Unit B 1981); Sibley v. Tandy Corp., 543 F.2d 540, 543 (5th Cir.1976), cert. denied, 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977). Basing their decisions upon an extension of the Supreme Court's analysis of the anti-waiver provision of the Securities Act of 1933 in Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), these opinions found the similar anti-waiver provision of the 1934 Act to expressly preclude arbitration of the private cause of action that Congress implied in section 10(b) of the 1934 Act. See, e.g., Sibley, 543 F.2d at 543 n. 3.
 
 
 14
 Defendants argue that the Supreme Court's decisions in Mitsubishi and in Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), implicitly overrule our established precedent. As this court recently held in Bustamante v. Rotan Mosle, Inc., neither of these Supreme Court opinions addressed the question of the arbitrability of 1934 Act claims. 802 F.2d at 816-817. We agree with Bustamante and four other circuits that, absent a clearer statement from the Court as to the arbitrability of 1934 Act claims, we must abide by the confirmed precedent of our circuit. Id.; accord Wolfe v. E.F. Hutton & Co., Inc., 800 F.2d 1032 (11th Cir.1986) (en banc); Jacobson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 797 F.2d 1197 (3rd Cir.1986); Conover v. Dean Witter Reynolds, Inc., 794 F.2d 520 (9th Cir.1986) (finding, as a matter of first impression, 1934 Act claims to be nonarbitrable); McMahon v. Shearson/American Express, Inc., 788 F.2d 94 (2d Cir.), cert. granted, --- U.S. ----, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986). Contra Phillips v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 795 F.2d 1393 (8th Cir.1986). We therefore hold that the district court did not err in refusing to compel arbitration of the 1934 Act claims.
 
 B.
 
 15
 The question of whether private RICO claims may be arbitrated is of first impression in this court.[5] Both the Second and Third Circuits have ruled on this question: the Second Circuit holding that private RICO claims may never be arbitrated, and the Third Circuit holding that such claims may be arbitrated when the offenses predicate to the required "pattern of racketeering activity" are arbitrable. McMahon v. Shearson/American Express, Inc., 788 F.2d 94 (2d Cir.), cert. granted, --- U.S. ----, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986); Jacobson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 797 F.2d 1197 (3rd Cir.1986). We hold that, at least in the context of claims like that sub judice, private RICO claims must be arbitrated under the Federal Arbitration Act.[6]
 
 
 16
 As the Third Circuit pointed out, RICO contains no anti-waiver provision similar to those of the 1933 and 1934 securities acts. Jacobson, 797 F.2d at 1202. In the instant case, the congressional intent as to the arbitrability of private RICO claims cannot be ascertained from the text of the statute. We turn, then, to the legislative history for guidance.
 
 
 17
 Added to the House version of the bill after the original bill had been passed by the Senate, the private treble-damages provision later codified as section 1964(c) received relatively little discussion in either house of Congress. See Sedima, S.P.R.L. v. Imrex Co., --- U.S. ----, 105 S.Ct. 3275, 3280, 87 L.Ed.2d 346 (1985). The congressional discussion of the treble-damages provision did not touch upon the arbitrability of claims brought under the provision. Accord Jacobson, 797 F.2d at 1202. Since Congress has not expressly indicated its intent as to the arbitrability of these claims, we examine the congressional purposes underlying the enactment of section 1964(c) to determine whether, because of an inherent conflict between these purposes and the arbitration of the claims, Congress implicitly intended that all such claims be non-arbitrable.
 
 
 18
 Representative Steiger introduced the private treble-damages provision to the House Judiciary Committee as a primarily compensatory, and secondarily deterrent, measure:
 
 
 19
 One possible amendment, for example, which I would raise for your consideration, would add a private civil damage remedy to title IX [the RICO subchapter of the Organized Crime Control Act], similar to the private damage remedy found in the anti-trust laws. Not every businessman, of course, will wish to take advantage of such a remedy, but those who have been wronged by organized crime should at least be given access to a legal remedy. In addition, the availability of such a remedy would enhance the effectiveness of title IX's prohibitions.
 
 
 20
 Hearings on S.30, and Related Proposals, before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess., 520 (1970) [hereinafter cited as House Hearings ]. The American Bar Association independently proposed an amendment to RICO "authorizing private damage suits based upon the concept of Section 4 of the Clayton Act." Id. at 544; see also id. at 559, 560 (identical proposal by ABA Section of Criminal Law).
 
 
 21
 While the bill was debated before the full House, several representatives referred to the private treble-damages provision. Representative Poff mentioned the provision as "another example of the antitrust remedy being adapted for use against organized criminality." 116 Cong.Rec. at 35,295 (1970); see also id. at 35,346 (Representative Poff noting that the provision "has its counterpart almost in haec verba in the antitrust statutes"). Representative Steiger asserted that "[i]t is the intent of this body, I am certain, to see that innocent parties who are the victims of organized crime have a right to obtain proper redress.... It represents the one opportunity for those of us who have been seriously affected by organized crime activity to recover." Id. at 35,346-47. Representative Mikva, referring to the treble-damages provision, proposed amending title IX of the bill to ensure that "we do not let some criminal law be abused by an overzealous competitor." Id. at 35,343. In proposing his amendment, which was rejected by the House, id., Mr. Mikva noted the similarity of the treble-damages provision to the antitrust laws and implied that the purpose of the provision was compensatory. Id. at 35,342 (describing the private treble-damages provision as "sauce for the goose" injured by organized crime whereas his amendment provided "protection for the gander" that might be injured by frivolous suits brought by an aggressive competitor).
 
 
 22
 While the bill was pending in the House, Senator McClellan brought the attention of the Senate to the proposed treble-damages amendment. Id. at 25,190. Senator McClellan explained that the proposed amendment would "authorize private civil damage suits based upon the concept of section 4 of the Clayton Antitrust Act. This amendment, particularly, should prove, if accepted by the House, to be a major new tool in extirpating the baneful influence of organized crime in our economic life." Id. It is difficult to evaluate from his statement whether the senator regarded the treble-damages provision as a primarily compensatory or deterrent measure. While the word "extirpate," to root out, suggests a more deterrent connotation, the sentence's object, the "baneful influence of organized crime in our economic life," suggests that the wrong addressed by the provision is the economic damage caused by organized crime--a wrong more appropriately addressed by compensatory measures than by deterrent measures.
 
 
 23
 The House passed the bill with the treble-damages provision in the form proposed by the Committee. Id. at 35,363-64; Sedima, 105 S.Ct. at 3281. The Senate did not seek a conference, and adopted the bill as amended in the House. 116 Cong.Rec. at 36,296; Sedima, 105 S.Ct. at 3281.
 
 
 24
 The legislative history of section 1964(c) thus reveals three currents of congressional purpose. First, and perhaps foremost, is the congressional intention of compensating "the victims of organized crime." Second, the provision was intended to deter organized crime by "enhanc[ing] the effectiveness of title IX's prohibitions." Finally, one notes that the most recurrent theme in the legislative history of the section is found in the repeated references to section 4 of the Clayton Act. Since these references to the Clayton Act could be argued to be an adoption by reference of the purposes of the Clayton Act's treble-damages provision, we survey the goals of the Clayton Act for further clarification of the congressional intent behind section 1964(c).
 
 
 25
 The Supreme Court in Mitsubishi thoroughly examined the legislative intent behind section 4 of the Clayton Act for the purpose of determining the arbitrability of section 4 claims. 105 S.Ct. at 3358-60. While acknowledging that "[t]he treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators," id. at 3358, the Court held that "[n]otwithstanding its important incidental policing function, the treble-damages cause of action ... seeks primarily to enable an injured competitor to gain compensation for that injury." Id. at 3359. Emphasizing the priority of the role of treble damages as compensation over its role as enticement for private attorneys general, the Court noted that the antitrust cause of action remains at all times under the control of the individual litigant, and that the private antitrust plaintiff needs no executive or judicial approval before settling a treble-damages suit. Id. Because the deterrent function was secondary to the compensatory function, the Court concluded that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." Id. at 3359-60.
 
 
 26
 Mitsubishi's reading of the legislative purpose of section 4 of the Clayton Act, recurrently invoked during the congressional discussion of RICO's private treble-damages provision, accords with our analysis of the legislative history of section 1964(c). The primary purpose of the section is to compensate those injured by organized crime; the section's secondary purpose is to deter racketeers from inflicting such injuries. Paralleling Mitsubishi's analysis, we find no evidence that Congress implied that all RICO claims be non-arbitrable. Since plaintiffs may effectively vindicate their section 1964(c) cause of action in the arbitral forum, the congressional purpose behind section 1964(c) will continue to be served.
 
 
 27
 The case sub judice presents yet another instance when, "[i]nstead of being used against mobsters and organized criminals, [section 1964(c) ] has become a tool for everyday fraud cases brought against 'respected and legitimate "enterprises." ' Sedima, 105 S.Ct. at 3287 (quoting Sedima, S.P.R.L. v. Imrex Co., 741 F.2d 482, 487 (2d Cir.1984)). The claims presented as a whole are the kind of claims for which the Commodity Futures Trading Commission has enacted extensive regulations governing arbitration. See 17 C.F.R. Secs. 180.1-.5 (1986). In cases like that before us, the congressional purposes of compensation and deterrence underlying section 1964(c)--to the extent that any considerations of deterrence are present--may be fulfilled by arbitration of the plaintiffs' claims. We hold, therefore, that the plaintiffs' RICO claims must be submitted to arbitration under the Federal Arbitration Act.
 
 IV.
 
 28
 The order of the district court denying defendants' motion to compel arbitration is AFFIRMED with respect to plaintiffs' 1934 Act claims; with respect to plaintiffs' private RICO claims the district court's order is REVERSED and REMANDED with instruction to compel arbitration in accordance with the Federal Arbitration Act and relevant agency regulations.
 
 
 
 [1]
 See Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1964(c), 1962 & 1961(1). Section 1964(c) provides treble damages for persons injured by RICO violations:
 (c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.
 18 U.S.C. Sec. 1964(c). Section 1962, in turn, describes the activities that RICO prohibits:
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....
 ....
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 18 U.S.C. Sec. 1962. Finally, section 1961 defines the key phrases "racketeering activity" and "pattern of racketeering activity":
 As used in this chapter--
 (1) "racketeering activity" means ... (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), ... or (D) any offense involving ... fraud in the sale of securities....
 ....
 (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity....
 18 U.S.C. Sec. 1961(1), (5).
 
 
 [2]
 Paragraph 13 of the Customer's Agreement signed by Elias and Marcia Sheinberg reads in pertinent part:
 Unless unenforceable due to federal or state law, any controversy arising out of or relating to my accounts, to transactions with [Shearson] for me or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules then in effect, of the National Association of Securities Dealers, Inc. or the Boards of Directors of the New York Stock Exchange, Inc. and/or the American Stock Exchange, Inc. as I may elect.
 Supplemental Record on Appeal at 7.
 The Commodity Account Agreements signed by Mayaja and Orart contained, as an addendum, a separately signed Arbitration Agreement that reads in part as follows:
 Any controversy arising out of or relating to the Corporation's account, to transactions with [Shearson] for the Corporation or to this agreement or the breach thereof, shall be settled by arbitration in accordance with the rules, then in effect, of the Board of Directors of the New York Stock Exchange, Inc. or of the American Arbitration Association Inc., as the Corporation may elect....
 While the Commodity Futures Trading Commission (CFTC) encourages the settlement of disputes by arbitration, it requires that your consent to such an agreement be voluntary. You need not sign this Arbitration Agreement to open an account with Shearson. (See 17 CFR 180.1-180.6)
 Id. at 14, 19.
 
 
 [3]
 We note jurisdiction over this interlocutory appeal under 28 U.S.C. Sec. 1292(a)(1). An appeal of an order denying a motion to compel arbitration falls within the purview of the decrepit Enelow-Ettelson rule, recently reiterated by this court as follows:
 "An order staying or refusing to stay proceedings in the District Court is appealable under Sec. 1292(a)(1) only if (A) the action in which the order was made is an action which, before the fusion of law and equity, was by its nature an action at law; and (B) the stay was sought to permit the prior determination of some equitable defense or counterclaim."
 Tenneco Resins, Inc. v. Davy Int'l, AG, 770 F.2d 416, 418 (5th Cir.1985) (quoting Jackson Brewing Co. v. Clarke, 303 F.2d 844, 845 (5th Cir.), cert. denied, 371 U.S. 891, 83 S.Ct. 190, 9 L.Ed.2d 124 (1962)) (emphasis in original); see Ettelson v. Metropolitan Life Ins. Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942). It is clear that the securities fraud and RICO claims are legal causes of action. See Cobb v. Lewis, 488 F.2d 41, 46 (5th Cir.1974) (claims for damages under securities fraud and antitrust laws are legal claims); see also Byrd, 105 S.Ct. 1238 (taking jurisdiction, without discussion, of appeal of order denying motion to compel arbitration in context of securities fraud claims). Since a stay pending arbitration is an equitable defense, Tenneco Resins, 770 F.2d at 419, the order appealed sub judice falls within the Enelow-Ettelson rule and is appealable.
 
 
 [4]
 "[C]ommerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation
 Federal Arbitration Act, 9 U.S.C. Sec. 1. Section 2 of the Act provides that a "written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. Sec. 2.
 
 
 [5]
 A panel of this court briefly addressed, in dicta, the question of the arbitrability of private RICO claims. Smoky Greenhaw Cotton Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 785 F.2d 1274, 1280-82 (5th Cir.1986). On petition for rehearing and suggestion for rehearing en banc, the panel noted that its reasoning on the RICO issue was seriously called into question by Mitsubishi. Id. at 1282. The panel therefore amended its opinion "to refuse to decide the arbitrability vel non of the plaintiffs' RICO claim." Id
 
 
 [6]
 We recognize that our decision accords neither with McMahon nor with Jacobson, further adding to the split already present among the circuits. McMahon, 788 F.2d 94 (2d Cir.), cert. granted, --- U.S. ----, 107 S.Ct. 60, 93 L.Ed.2d 20 (1986); Jacobson, 797 F.2d 1197 (3rd Cir.1986) (2-1 decision). We respectfully cannot agree with the reasoning of either of these two opinions
 McMahon based its holding that RICO claims can never be arbitrated on "strong policy concerns, the need for development of the record, and judicial clarification and resulting consistency in resolving disputes under this relatively new statute." 788 F.2d at 99. The policy concerns mentioned by the court were developed by analogy to American Safety Equip. v. J.P. Maguire & Co., Inc., 391 F.2d 821 (2d Cir.1968), a Second Circuit opinion banning arbitration of antitrust claims. American Safety argued that a "plaintiff asserting his rights under the [Sherman] Act has been likened to a private attorney-general who protects the public's interest." 391 F.2d at 826. McMahon held that comparable concerns inherent in the enforcement of RICO claims precluded their arbitration. 788 F.2d at 98.
 We decline to follow McMahon because, as the Third Circuit noted, "the McMahon court paid too little deference to the Supreme Court's decision in Mitsubishi." Jacobson, 797 F.2d at 1202. McMahon ignores Mitsubishi 's instruction that congressional intent governs the analysis of arbitrability of a statutory claim under the Arbitration Act. After Mitsubishi, "determining statutory claims to be nonarbitrable on the basis of some judicially recognized public policy rather than as a matter of statutory interpretation is no longer permissible." Id. Since McMahon does not base its decision on a statutory interpretation of section 1964(c), we cannot follow its analysis. Moreover, we find McMahon 's reliance on American Safety misplaced. Although the Supreme Court did not explicitly overrule American Safety in the domestic context, Mitsubishi rejected so much of American Safety 's reasoning it is difficult to say what is left of the opinion to rely on. See Mitsubishi, 105 S.Ct. at 3357-60. Certainly the Court rejected that portion of American Safety 's reasoning relied upon by McMahon. See id. at 3359 ("Notwithstanding its important incidental policing function, ... Sec. 4 of the Clayton Act ... seeks primarily to enable an injured competitor to gain compensation for that injury.").
 On the other hand, we must also respectfully decline to follow the reasoning of the Third Circuit. Jacobson defined the relevant field of statutory interpretation as consisting of (or at least including) the predicate statutes necessary for a section 1964(c) action: "Because of the unique structure of the RICO statute, which cross-references other predicate statutes, we must, in making the statutory interpretation required by Wilko and Mitsubishi, look to those statutes as well." Jacobson, 797 F.2d at 1202. In fact, Jacobson did not examine section 1964(c)'s text or legislative history, instead relying exclusively upon the text of predicate statutes. See id. at 1203. Following precedent holding 1934 Act claims to be non-arbitrable, Jacobson ruled that RICO claims based on predicate violations of the 1934 Act were not subject to arbitration. Id. Finding no indication of a congressional intent to make violations of the federal mail fraud statute, 18 U.S.C. Sec. 1341, and wire fraud statute, 18 U.S.C. Sec. 1343, non-arbitrable, however, Jacobson held that RICO claims founded upon these predicate statutes were arbitrable. 797 F.2d at 1203.
 We find, however, that a claim under section 1964(c) is logically discrete from claims under its predicate statutes. As Judge Adams observes in his dissent from the majority opinion in Jacobson :
 A private right of action under RICO is a unique and separate claim to which the Arbitration Act logically applies. RICO is a manifestation of congressional concern with the special harm caused by those who engage in a pattern of wrongful offenses, and the private right of action under the RICO statute is distinct from one based on an underlying offense alone.
 Jacobson, 797 F.2d at 1209 (Adams, J., dissenting). Judge Adams also notes that the difference between the RICO action and its predicate violations is demonstrated by the structure of the RICO statute. Unlike any individual predicate offense, RICO proscribes the operation of any "enterprise" engaged in or whose activities affect interstate or foreign commerce, using income derived from a "pattern of racketeering activity." Id. (citing 18 U.S.C. Sec. 1962). "Pattern of racketeering activity" is defined as at least two violations of any predicate statute within a ten-year period. 18 U.S.C. Sec. 1961(5). Section 1964(c) further adds the requirement that the plaintiff asserting a private RICO action have been injured by the "enterprise" as a result of such "racketeering activity." Thus, by its very structure, the RICO claim is distinct from its predicate offenses.
 Judge Adams criticizes the majority opinion in Jacobson for splitting a single RICO count when that count is predicated upon arbitrable and non-arbitrable offenses:
 [T]he result reached by the majority would divide that [single RICO] count in order to allow for arbitration of the mail and wire fraud issues and litigation in a court of the securities issues--despite the fact that the unique RICO offense depends, in this case, on whether the enterprise has engaged in mail and wire fraud as well as securities fraud within a ten-year period.
 Id. at 1210 (emphasis in original). The fallacy in Jacobson 's reasoning is further pointed out by its handling of the mail and wire fraud issues. The majority opinion held that RICO claims predicated upon mail or wire fraud statutes are arbitrable because "[n]o provision of the mail or wire fraud statutes bears any similarity to the anti-waiver provision of the 1933 and 1934 securities acts." Id. at 1203. No such anti-waiver provision can be found in the mail and wire fraud statutes because these are criminal felony statutes; arbitration of a felony charge simply does not occur in our legal system. A court searching for congressional intent as to arbitrability in criminal statutes will always return with empty hands. Private parties such as the plaintiffs in this case do not have standing to bring suit under these statutes. Only through RICO's section 1964(c) do they have standing to invoke these mail and wire fraud statutes at all, and it is, logically, to RICO that courts must look to determine the arbitrability of their claims.